## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| CHRISTINA ROBERTS, | |
| Plaintiff, | Civil Action No.: 1:22-CV-0284-MLB-JKL |
| v. | |
| ANKLE AND FOOT CENTERS OF GEORGIA, LLC and MEDICAL MANAGEMENT SOLUTIONS OF AMERICA, LLC, | **JURY TRIAL DEMANDED** |
| Defendants. | |

## COMPLAINT FOR DAMAGES

Plaintiff Christina Roberts ("Roberts" or "Plaintiff") files this Complaint for Damages against Defendants Ankle and Foot Centers of Georgia, LLC ("AFCG") and Medical Management Solutions of America, LLC ("MMSA") (collectively "Defendants"), showing the Court as follows:

### JURISDICTION AND VENUE

1. Roberts brings claims pursuant to the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.* ("FMLA"), the Families First Coronavirus Response Act ("FFCRA"), Pub. L. No. 116-127, 134 Stat. 178 (2020), the Fair Labor

Standards Act, 29 U.S.C. § 201 *et seq*. (the "FLSA"), and for breach of contract under Georgia law.

2.  Roberts invokes the jurisdiction of this Court pursuant to 28 U.S.C. §§ 1331 (federal question) and seeks supplemental jurisdiction over her related state law breach of contract claim.

3.  The unlawful employment practices alleged in this Complaint were committed within the Atlanta and Newnan Divisions of this District.  In accord with 28 U.S.C. § 1391, venue is appropriate in this Court.

### THE PARTIES

4.  Roberts is an adult citizen of the United States who resides in Conyers, Georgia in Rockdale County and submits herself to the jurisdiction of this Court. Roberts worked for Defendants for nine years in the position of Patient Services Representative until 2021.

5.  AFCG is a for-profit limited liability corporation licensed to do business in Georgia.

6.  AFCG operates multiple medical offices across metro Atlanta counties and is headquartered at 1975 Highway 54W, Suite 205, Peachtree City, Georgia 30269.

7.  At all times material AFCG has conducted business within this District.

8.  MMSA is a for-profit limited liability corporation licensed to do business in Georgia.

9.  MMSA provides financial, human resources, and administrative services and support to each of AFCG's medical offices, including the multiple offices in which Plaintiff worked in this district.

10. MMSA is headquartered in the same office as AFCG at 1975 Highway 54W, Suite 205, Peachtree City, Georgia 30269.

11. At all times material MMSA has conducted business within this district.

12. AFCG and MMSA have the same registered agent.  Defendants may be served with process by delivering a copy of the summons and Complaint to their registered agent Joseph Giovinco at 1975 Highway 54W, Suite 205, Peachtree City, Georgia 30269.

13. During all times relevant to Plaintiff's claims, Defendants were each and jointly Plaintiff's "employer" within the meaning of the FMLA, FFCRA, and FLSA. Defendants controlled the terms and conditions of Plaintiff's employment, had oversight of and controlled Plaintiff's daily work activities, directed Plaintiff's work, furnished the equipment and resources necessary for Plaintiff's work and utilized in Plaintiff's performance of her job duties, and provided the facilities where Plaintiff's work was performed.

3

14. During all times relevant to Plaintiff's claims, Plaintiff was an "employee" of each of the Defendants within the meaning of the FMLA, FFCRA, and FLSA.

15. At all relevant times, each Defendant was a company with less than 500 employees subject to the FFCRA, which in turn is comprised of the Emergency Paid Sick Leave Act (EPSLA).

16. At all relevant times Plaintiff was an "eligible employee" of each Defendant within the meaning of the FMLA.  Each Defendant employed fifty (50) or more employees within a seventy-five (75)-mile radius of the worksites at which Plaintiff worked during each of at least twenty calendar workweeks per year.

17. At all relevant times each of the Defendants was an employer engaged in interstate commerce within the meaning of Sections 206 and 207 of the FLSA.

18. Each Defendant had gross annual revenues in excess of $500,000 at all times relevant to Plaintiff's claims.

19. At all times relevant to Plaintiff's claims, Plaintiff was classified as a non-exempt employee, paid on an hourly basis.  As a non-exempt employee, Plaintiff was to be paid at an overtime rate of time-and-one-half her regular rate for any hours worked over forty in any workweek.

20. Plaintiff's employment with Defendants ended on July 29, 2021.

## STATEMENT OF FACTS

21. During her employment with Defendants, Plaintiff at all times received favorable feedback about her work performance.  Plaintiff was never subject to written discipline while working for Defendants.

22. As a Patient Services Representative, Plaintiff could work in any of Defendants' offices. Although Plaintiff was typically scheduled to work in one location each workweek, Defendants would frequently contact her and ask her to report to work at a different location, including at times asking Plaintiff to travel from one medical office to another in the same workday.

23. Plaintiff's job responsibilities included preparing patients' charts two days in advance of their scheduled appointments.  This work included contacting the patient's insurance companies regarding patient benefit information and reviewing insurance codes and coverage information.  Plaintiff also prepared or pulled together a fee ticket, encounter form, last office notes, and insurance verification information as part of this advance preparation process.  Plaintiff also scheduled Dr. Roman's surgeries, including ordering necessary equipment for each procedure and contacting the hospital regarding dates and times.  Patient further ordered inventory for the office and was required to do all office cleaning. When Defendants directed Plaintiff to cover another

medical office in addition to her regular office assignment, she was forced to perform this work for multiple locations.

24. Defendants did not permit Plaintiff to clock in for purposes of recording her work time before her scheduled start time on workdays and did not permit her to record time worked at home.  To the extent Defendants' required approval for Plaintiff to work hours outside her scheduled shift, Defendants denied Plaintiff such approvals knowing that she would have to do the work off the clock.

25. Plaintiff's job responsibilities required her to routinely start working hours before her scheduled start time in order to complete the work necessary for that day's scheduled appointments.  Plaintiff also worked at home to do work that could not be completed during her scheduled hours.  At all times relevant to her claims, Plaintiff's  pre- and post-shift work time each workday was not recorded in Defendants' timekeeping systems, and Plaintiff was not paid for such work time.

26. In order to avoid performing work off the clock Plaintiff repeatedly asked Defendants for more help to reduce the volume of her workload but Defendants consistently failed to assign additional employees or provide other support to Plaintiff in response to her requests.

27. At all times relevant to Plaintiff's claims Defendants knew or should have known that Plaintiff performed work off the clock prior to the scheduled start time of her work days and/or after clocking out.   For example, Plaintiff was required to disarm the alarm system when entering Defendants' offices, would login to programs like Epic to begin working before her scheduled start time, and would set the alarm upon departure.

28. At all times relevant to Plaintiff's claims Defendants knew or should have known that Plaintiff was not permitted to record her travel time between Defendants' medical offices in any work day as work time.

29. From time to time Defendants' hourly employees, including Plaintiff, forgot to punch out of the time recording system at the end of their work day. Defendants' payroll processing flagged these timeclock issues on a missed punch-type report, and employees who missed a time punch were contacted to find out their time worked that day.  On multiple occasions, however, Plaintiff forgot to clock out at the end of a busy work day, was not contacted about her failure to record her ending work time, and her hours worked on those days were never recorded as work hours.

30. On August 24, 2020 Plaintiff's husband was treated for a heart attack, a serious health condition, at a hospital near the medical office where Plaintiff

was working for Defendants that day.  Plaintiff called Defendants' scheduling coordinator and informed her that her husband was being treated in the hospital for a heart attack and that she needed to leave work.  Defendants' scheduling coordinator, Tiffany Cavener ("Cavener"), told Plaintiff that she could not leave work that day and berated Plaintiff for pleading to be allowed to leave work to be present during her husband's emergency medical treatment.

31. Plaintiff advised Defendants in the fall of 2020 that her father was suffering from a serious medical condition and that she was acting as his caregiver.

32. On November 2, 2020, Plaintiff's 17 year-old son, who lived with her, tested positive for COVID-19.  In accord with Defendants' protocols and Centers for Disease Control and Prevention's ("CDC") guidelines, Plaintiff immediately contacted Defendants' Human Resources ("HR") department and advised that she would need to quarantine due to her son's positive test result, her exposure to COVID-19, and to care for her son while he was sick. The HR representative responded that Defendants wanted Plaintiff to return to work, rather than quarantining, despite the fact that most of the patients visiting Defendants' medical office were in high risk categories for COVID-

19 exposure, including senior citizens and a large majority of patients who suffered from diabetes.

33. Plaintiff did not return to work as requested and took care of her son in quarantine.  Plaintiff then tested positive for COVID-19 on November 7, 2020 and did not return to work until November 23, 2020.   Both Plaintiff and her son were quarantining during the relevant time period on the advice of a healthcare provider, pursuant to federal and state orders, in accord with then-applicable CDC guidance, and/or because they were experiencing COVID-19 symptoms and seeking a medical diagnosis.

34. At no time between November 2, 2020 and November 23, 2020 did Plaintiff receive any paid sick leave pursuant to the FFCRA or EPSLA from either Defendant.   Instead, Defendants applied Plaintiff's personal accrued paid leave to her absences.

35. On February 2, 2021, Plaintiff made a request to Defendant for intermittent FMLA leave to care for her father related to his serious health condition, asking for permission to take half days on Mondays and Fridays.  Defendants did not immediately provide Plaintiff with a response regarding whether she could take intermittent FMLA leave.

36. On February 9, 2021, Plaintiff began experiencing severe shoulder pain and shortness of breath.  She called Defendants' scheduling coordinator at 6:30 a.m. to report her own serious health condition and need to leave for treatment and was told the coordinator would see what could be done.  Plaintiff called a second time to report the same condition and need for immediate medical treatment, and Defendants' scheduling coordinator began yelling at Plaintiff, telling Plaintiff that Defendants had 13 offices understaffed and there was "no one" to cover for her.  Concerned for her own health and safety, Plaintiff sent an email to Defendants' Human Resources mailbox, and around 10:30 a.m. another employee showed up at the location so that Plaintiff could leave and seek necessary medical treatment.   Plaintiff received treatment from a physician on February 9, 2021 for severe stress and anxiety and received continuing treatment related to those conditions thereafter.

37. After February 9, 2021, Plaintiff and Cavener participated in a phone call with Jennifer Crowder ("Crowder"), a Revenue Cycle Coordinator for Defendants, and Joe Giovinco, Jr. ("Giovinco"), the son of Defendants' owner Dr. Joseph Giovinco, and a management-level employee of Defendants.  During that call Giovinco told Plaintiff that Defendants would allow her to take Mondays and Fridays off to care for her father.

38. On February 11, 2021, Defendants' Human Resources department sent Plaintiff an email attaching FMLA paperwork to be completed and providing her with notice of her FMLA rights.  At 10:11 a.m. on February 12, 2021, Plaintiff advised Defendants again that for purposes of FMLA leave she was requesting only intermittent leave in the form of two half days off as other family members would be able to provide care for her father in addition to her.

39. Before Plaintiff could even return the FMLA paperwork, however, Giovinco replied to Plaintiff's February 12, 2021 email at 3:28 p.m. on February 12, 2021 telling Plaintiff, "We are not approving half days at this time.  The job role you are in is a full time position requiring 40hrs/week over a 5 day period. Please know that half days are NOT approved.  At this time, we have patient complaints from Covington regarding the lack of communication and we are not in a position to keep doing this.  We are very eager and happy to accommodate you with the FMLA, but we cannot do half days because it causes an undue burden on the patients.  You do not have permission to work half days next week."

40. After Giovinco denied Plaintiff's request for intermittent leave, Defendants informed Plaintiff on February 18, 2021 that she would be moved from her

regular Covington, Georgia work location to their Conyers, Georgia medical office but that she would still be required to schedule the surgeries for Dr. Roman who was the medical provider for Covington.  Defendants informed Plaintiff that Conyers was a "two person front desk, this will allow you to take off easy due to family matters," and Plaintiff responded that she would be in Conyers as assigned the next week but that she could not cover the additional responsibility of Dr. Roman's surgeries.

41. When Plaintiff began working at the Conyers location as assigned, however, the second person who had been working at that location for about four years was moved to another of Defendants' medical offices the same day, such that the Conyers assignment was not in fact a "two person front desk," and Plaintiff would again be working alone but now in a medical office that had two doctors, rather than one at Covington, and a higher patient flow.

42. By March 21, 2021 Plaintiff's father's condition deteriorated and a nurse providing him with home care visits advised that he would not survive the week.  Plaintiff went to work as scheduled on March 22, 2021 but contacted Defendants' scheduling coordinator and begged her to get someone to cover for Plaintiff so she could care for her father.  Cavener told Plaintiff there was "no one" to cover for her.  Plaintiff later called a friend who worked in

Defendants' surgical billing department, and when the friend heard what Plaintiff was experiencing, she told Plaintiff she could come to the Conyers office and cover for Plaintiff that week.  Plaintiff called Cavener back to tell her someone was going to cover for her, and Defendants' agents repeatedly asked Plaintiff "how long" she was going to be out.  Two days later Defendants sent Plaintiff a text message asking her for an "update" on how long she would be out.  Plaintiff's father died that week, and Plaintiff returned to work on March 29, 2021.

43. On June 2, 2021 after communicating with her friend who worked in surgical billing for Defendants about her interest in a position in that department, Plaintiff received a call from Lori Alverez ("Alverez"), Defendants' surgical billing department head, offering Plaintiff a position in the department and a pay increase of $1.50/hr.  Plaintiff accepted and was told by Alverez that Defendants needed to find a replacement for her at the Conyers office before she could move to the new position.  Alverez told Plaintiff that Crowder would be working on finding her replacement.

44. Plaintiff's sister died suddenly on July 7, 2021.  Plaintiff contacted Defendants about taking bereavement leave in accord with Defendants' policy but went into work as scheduled the next day.  After her sister was buried, Plaintiff

returned to work on July 13, 2021 and learned from a new employee that the employee had been told Plaintiff "had no clue what [she] was doing and not to listen to anything [Plaintiff] said.  The new employee was also promoted to "trainer" by Defendants the same day, although she had worked for Defendants less than three months.

45. Plaintiff sent an email to Human Resources on July 16, 2021, again engaging in protected activity by complaining about Defendants' constant harassment and retaliation against her based on her efforts to exercise protected federal rights. Defendants conducted no investigation of Plaintiff's complaint. Instead, on July 27, 2021, HR advised Plaintiff that she would no longer receive the promotion to the surgical billing department or the promised higher hourly pay.

46. Defendants treated similarly situated employees who had not engaged in protected activities more favorably.  For example, Defendants regularly told Plaintiff she needed to go to other medical office locations to cover for employees but consistently told Plaintiff there was "no one" to cover for her when she requested FMLA-related leaves on multiple occasions.

47. On July 22, 2021 Plaintiff was told she had to cover for an employee who was out at Defendants' Stockbridge medical office.  While Plaintiff was working

in Stockbridge that day Crowder told her she would also need to cover for the Stockbridge employee on July 26, 2021.  As a result of Defendants' continued retaliation, Plaintiff was experiencing severe stress and anxiety which caused Plaintiff to have a mental and emotional breakdown.  Plaintiff provided Crowder with a doctor's note saying she needed to be out of work the week of July 26, 2021.

48. Because of Defendants' demands, however, Plaintiff prepared the patient charts on July 26, 2021 and agreed to work in Stockbridge as assigned on July 28, 2021, rather than taking protected leave. In her communications with Cavener, Crowder, and Defendants' HR, Plaintiff asked that whomever covered for her on July 27, 2021 complete chart prep for July 28, 2021, as patient visits started at 7:00 a.m. that day in that location.  When she reported to Conyers on July 28, 2021, she found that no one had prepared for patient visits that day and immediately emailed Crowder, Cavener, and Defendants' HR to say she needed help right away.  Defendants responded that there was no help available.

49. As of July 28, 2021, Plaintiff knew that Defendants would not permit her to exercise her right to intermittent FMLA leave for her serious health condition, would continue to retaliate against her, and had taken away the promised

promotion and pay increase.  Defendants made Plaintiff's work conditions so intolerable that any reasonable person in the same situation would have felt forced to leave.  Plaintiff submitted her written resignation on July 28, 2021, giving two weeks' notice to be professional, and continued to work her assigned shift.  In response, Crowder emailed her that she would need to work at Defendants' College Park location on July 29, 2021.

50. Plaintiff spoke with Defendants' managing agent Dr. Pearson on July 28, 2021 after she copied him on her resignation.  Plaintiff told him about the retaliation and hostile treatment she was experiencing and told him that she felt she was going to have to resign due to the stress and anxiety Defendants' treatment caused and the continuing nature of the retaliation.  Plaintiff told Dr. Pearson that she felt Defendants were backing her into a corner, and she had nowhere to turn. After the conversation, Plaintiff understands Dr. Pearson contacted Defendants regarding Plaintiff's concerns.  Defendants failed to conduct any investigation into any of Plaintiff's concerns reported to Cavener, Crowder, HR, and Dr. Pearson.

51. Crowder came to the College Park office while Plaintiff was working on July 29, 2021, and Plaintiff told Crowder that she did not want to resign.  She asked Crowder why Defendants were treating her so poorly.  Crowder said she was

going to be at a meeting with Dr. Pearson the next day and would be discussing everything with him and others.  She then said she needed Plaintiff's office key because offices were being rekeyed and would return it to Plaintiff on Monday.

52. Rather than permitting Plaintiff to continue working after she changed her mind about resigning or even discussing Plaintiff's complaints at the meeting Crowder referenced, after Plaintiff left Defendants' medical office on July 29, 2021, Defendants' HR representative called Plaintiff and told her that Defendants' had "found coverage" and Plaintiff would not be returning to work after July 29, 2021.  Defendants terminated Plaintiff's employment effective July 29, 2021.

53. Defendants' policies provided Plaintiff and other employees with paid time off and paid bereavement leave.   When Plaintiff's sister died Defendants required her to use accrued paid time off instead of allowing her to use paid bereavement leave.

54. Plaintiff and other employees were entitled to be paid for all accrued but unused paid time off upon separation.  Plaintiff was not paid for all accrued and unused paid time off when Defendants terminated her employment.

## COUNT I: FMLA VIOLATIONS –  PLAINTIFF'S INTERFERENCE AND RETALIATION CLAIMS AGAINST DEFENDANTS

17

55. Plaintiff reasserts and incorporates paragraphs 1-16, 20, and 20-52 of the Complaint by reference.

56. At all times relevant, Plaintiff worked sufficient hours to qualify for FMLA leave.  At all material times, Plaintiff has been an "eligible employee" of Defendants within the meaning of the FMLA.

57. During the relevant time period, Price was entitled to leave, including but not limited to intermittent leave, under the FMLA related to a) the need to care for a family member suffering from a serious health condition, and b) the serious health conditions from which she suffered. Defendants denied Plaintiff the right to use intermittent FMLA leave and further subjected her to adverse treatment in retaliation for her efforts to exercise FMLA rights.

58. Defendants interfered with, restrained and/or failed to allow Plaintiff to take FMLA leave to which she was entitled despite its knowledge of her need for FMLA leave.

59. Defendants further subjected Plaintiff to adverse employment actions due to her attempts to exercise rights protected by the FMLA.  Plaintiff was subjected to hostile treatment and to disparate terms and conditions of employment as compared to employees who did not seek to exercise FMLA rights, denied protected leave, and eventually terminated.

60. Defendants would not have taken these adverse employment actions had Plaintiff not requested leave that should have been granted in accord with the FMLA.

61. Defendants' actions resulted in Plaintiff's out of pocket losses and deprived Plaintiff of job-related economic benefits, including income in the form of wages and other job-related benefits.

62. Defendants' violation of the FMLA was knowing and willful.  Each Defendant knew or showed reckless disregard for the fact that its conduct was in violation of the FMLA.

63. Plaintiff is also entitled to reinstatement to Defendants' employment, or, if reinstatement is not feasible under the circumstances, Plaintiff is entitled to an award of damages for future lost wages and benefits of employment.

## COUNT II - FFCRA VIOLATIONS

64. Plaintiff reasserts and incorporates paragraphs 1-16, 32-34, and 56 of the Complaint by reference.

65. Plaintiff was eligible for sick and paid leave under the FFCRA.  Plaintiff requested leave because she perceived she was unable to work because of her exposure to her family member diagnosed with COVID-19 and within a few days, her own positive COVID-19 diagnosis.

66. Defendants interfered with Plaintiff's rights under the FFCRA by telling her she needed to report to work in violation of CDC guidelines, local orders then in effect, and Defendants' own stated protocols.

67. Defendants failed to provide Plaintiff with paid sick leave in accordance with the FFCRA's requirements and forced Plaintiff to use her own accrued paid time off.

68. Defendants otherwise unlawfully retaliated against Plaintiff and discriminated against Plaintiff because of conduct protected by the FFCRA.

69. Defendants' conduct was not in good faith and Defendants had no reasonable grounds for believing their conduct was not in violation of the FFCRA.

70. Defendants' conduct was willful and intended to deprive Plaintiff of rights under the FFCRA.

71. Plaintiff sustained damages as a result of Defendant's conduct, and Defendants are also liable for liquidated damages under the FFCRA.

### COUNT III:  FLSA VIOLATIONS – FAILURE TO PAY OVERTIME COMPENSATION

72. Plaintiff reasserts and incorporates paragraphs 1-19 and 21-20 of the Complaint by reference.

73. Defendants failed to record and/or compensate Plaintiff for all hours worked in each workweek, including work Plaintiff performed pre-shift, Plaintiff's

travel time between work locations during workdays, and other work Plaintiff performed post-shift and/or off the clock.  Had all of Plaintiff's work hours been recorded as required by the FLSA, Plaintiff would have worked more than 40 hours per week in many workweeks during the relevant time period.

74. From at least 2019 through July 2021 Defendants required, suffered and/or permitted Plaintiff to work more than forty (40) hours per week without paying Plaintiff time and one-half her regular hourly rate for all hours worked over forty (40) in a week.

75. Defendants failed to maintain accurate records of Plaintiff's actual work hours in violation of the FLSA's recordkeeping requirements.

76. As the direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered a loss of income including unpaid overtime and other damages.

77. Defendants' conduct, as alleged, constitutes a willful violation of the FLSA within the meaning of 29 U.S.C. §255(a).  Defendants knew or showed reckless disregard for the fact that their pay practices were in violation of the law.

78. As a result of the unlawful acts of Defendants, Plaintiff has been deprived of overtime wages at a rate of one and one-half her regular hourly rate of pay for any and all hours worked over forty (40) in any workweek in an amount to be

determined at trial, and is entitled to recovery of such amounts, liquidated damages, prejudgment interest, attorneys' fees and costs.

## COUNT IV:  BREACH OF CONTRACT UNDER GEORGIA LAW

79. Plaintiff reasserts and incorporates paragraphs 1-16, 20, 52-54 of the Complaint by reference.

80. Plaintiff and Defendants entered into a contract whereby Defendants agreed to allow Plaintiff to work to accrue paid time off and also agreed to pay Plaintiff for time off related to bereavement.  In exchange, Plaintiff agreed to provide services for Defendant over time.

81. Plaintiff complied with all conditions and requirements of the contract.

82. Defendants breached the contract by failing to compensate Plaintiff in accord with the terms of the contract, including but not limited to improperly reducing Plaintiff's accrued paid time off and not paying Plaintiff for all paid time off accrued upon her separation.  Defendants' breach is continuing.

83. As a result of Defendants' breach, Plaintiff suffered damages and is entitled to an award of her losses.

## PRAYER FOR RELIEF

Plaintiff seeks judgment on her claims against Defendants and relief as follows:

22

(a)   Trial by jury as to all issues so triable;

(b)   Judgment for all damages, lost wages, benefits or other expenses which Plaintiff sustained as a result of Defendants' conduct in violation of the FMLA, including an equal amount as liquidated damages, and attorneys' fees and costs;

(d)   Judgment for all damages and lost wages Plaintiff sustained as a result of Defendants' conduct in violation of the FFCRA, including an equal amount as liquidated damages, and attorneys' fees and costs;

(e)   Judgment for all unpaid overtime wages, liquidated damages, prejudgment interest on unpaid wages, and reasonable attorneys' fees and costs in accord with the FLSA;

(f)   Judgment for all damages incurred as a result of Defendants' breach of contract;

(g)   In the alternative, award(s) of nominal damages under the FMLA, FFCRA, FLSA, and/or for breach of contract;

(h)   Judgment ordering reinstatement of Plaintiff or an award of front pay equivalent to the pay and benefits Plaintiff would likely have earned were it not for Defendants' unlawful acts in violation of the FMLA;

(i)     Judgment awarding pre-judgment interest on all unpaid wages or other damages from the date such wages were earned and due or such damages were incurred;

(j)     Judgment awarding Plaintiff reasonable attorneys' fees and expenses of litigation as provided for under the statutory claims at issue;

(k)     A permanent injunction enjoining Defendants, their officers, agents, successors, employees, attorneys and those acting in concert with them from engaging in (i) any employment practice or policy which discriminates or retaliates against employees in violation of the FFCRA, (2) any employment practice or policy which interferes with rights protected under the FMLA or FFCRA and/or retaliates against employees in violation of the FMLA or FFCRA; and (3) any other equitable relief as may be appropriate to effectuate the purposes of the FLSA;

(l)     All other relief to which Plaintiff may be entitled.

Respectfully submitted, this 24th day of January, 2022**.**

*/s/Tracey T. Barbaree*
Tracey T. Barbaree
GA Bar No. 036792
Beth A. Moeller
GA Bar No. 100158
MOELLER BARBAREE LLP
1175 Peachtree St. NE
Suite 1850
Atlanta, GA  30361
404.748.9122

*Attorneys for Plaintiff*